Argued and submitted December 30, 1991, conviction for possession of controlled substance reversed and remanded for new trial; otherwise affirmed July 8, 1992

# STATE OF OREGON,
*Respondent,*

*v.*

# DAVID LEE REDMOND,
*Appellant.*

## (90-0811; CA A69318)

834 P2d 516

James F. Callahan, Tigard, argued the cause and filed the brief for appellant.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Buttler, Presiding Judge, and Rossman and De Muniz, Judges.

De MUNIZ, J.

## De MUNIZ, J.

Defendant appeals his convictions for unlawful possession of a firearm, ORS 166.250, and possession of a controlled substance. ORS 475.992. He contends that the trial court erred in denying his motion to suppress evidence seized as a result of a frisk and subsequent search of his person during a traffic stop for several minor equipment violations. We affirm the conviction for unlawful possession of a firearm and reverse and remand on the conviction for possession of a controlled substance.

On March 25, 1990, at 1:23 a.m., Deputy Green observed three motorcycles and a Cadillac traveling south on McLoughlin Boulevard. Green and his partner, Deputy Shumway, followed the vehicles. The motorcyclists were all wearing black leather jackets and denim vests. The vests displayed the insignia of the "Brother Speed" motorcycle club.[1] Defendant's motorcycle had excessively high handle bars, ORS 814.300(1); a "blue-dot" tail light, ORS 816.080(2); no turn signals, ORS 816.320(1)(e); and a license mounted so that it was not easily visible. ORS 803.550(2). Green notified the dispatcher that he was about "to stop a possible motorcycle gang" and requested assistance. He then turned on his overhead lights and tried to stop the group. The driver of the Cadillac pulled to within half a car length of the motorcycles "in an apparent attempt to prevent [Green] from getting behind [the motorcycles]." Green forced his way between the car and the motorcycles, and the riders pulled over to the curb. Green then stopped his patrol car and approached defendant.

Defendant had a patch on the back of his vest that identified him as the "Sergeant-at-Arms" of the Portland chapter of the Brother Speed club. While defendant was removing his helmet and goggles, Green saw a sheathed knife, which he immediately seized. He then frisked defendant and felt a number of "extremely hard, bulky items." Green began removing the items, more or less in the order in which he had felt them, to determine what they were. In defendant's inside vest pocket, he found a gun. After notifying the other officers

---

[1] The insignia depicts "a skull with a cigarette dangling from its mouth."

present that he had found a gun, Green handcuffed defendant and proceeded to search him more thoroughly.

In the course of that search, Green found a small blue box and a brass and plastic pipe that contained marijuana residue.[2] He then asked defendant's consent to open the blue box. Defendant refused. Thinking that the box might contain a weapon, Green opened it and found a small bindle of "a white, chunky powdery substance" that he believed to be methamphetamine. He arrested defendant for unlawful possession of a firearm and possession of a controlled substance. He also seized defendant's motorcycle and his wallet for forfeiture pursuant to a county ordinance. Defendant was then transported to the county jail.

While defendant was being "booked," Green opened the wallet to seize the money that he had seen in it earlier. When he removed the money, another small bindle of "white, chunky powdery substance" fell from the wallet. Green asked defendant what the bindle contained. Defendant replied, "I don't know." Laboratory analysis later revealed that the substance in both bindles was methamphetamine.

Defendant moved to suppress all the items seized. He argued that the seizures resulted from an illegal frisk. The court concluded that the frisk was lawful, because Green reasonably suspected that defendant might pose an immediate risk of serious physical injury. The court also concluded that the warrantless search of the blue box was unlawful and suppressed the methamphetamine found in it. However, the court concluded that the bindle of methamphetamine that had been in defendant's wallet would inevitably have been discovered as a result of jail inventory procedures and did not suppress it.

Defendant concedes that he was lawfully stopped.[3] He contends, however, that the frisk was unlawful because,

---

[2] Green asked defendant about the contents of the pipe, and defendant replied that it was marijuana.

[3] ORS 810.410(3) provides:

"A police officer:

"* * * * *

"(b) May stop and detain a person for a traffic infraction for the purpose of investigation reasonably related to the traffic infraction, identification, and issuance of citation."

once the knife had been seized, Green could not have reasonably suspected that defendant was presently armed and dangerous. We must determine whether the circumstances confronting Green supported a reasonable suspicion, based on particularized facts, that defendant might pose an immediate threat of serious physical injury to him. *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987).

When Green encountered defendant and the other riders, it was one o'clock in the morning. His efforts to stop defendant had been obstructed by a car associated with defendant and the other riders. Green's training had made him aware that motorcycle club members "are known to carry various items of harm to [police officers] or the general public." In addition, he believed that the patch on defendant's jacket that identified him as the "Sergeant-at-Arms" of the club meant that defendant was an "enforcer" for the club and that he was likely to be armed. However, Green's perceptions of the stereotypical practices of motorcycle club members is the kind of generalized suspicion that seldom will constitute a reasonable suspicion based on particularized facts. *See State v. Baldwin*, 76 Or App 723, 729, 712 P2d 120 (1985), *rev den* 301 Or 193 (1986).

■ In this instance, Green's generalized understanding of the practices of motorcycle club members became a specific and particularized reality when he saw that defendant was armed with a knife. The fact that he seized that most immediate and obvious threat, before undertaking a complete frisk, does not diminish the reasonableness of Green's belief that defendant might be armed with additional weapons and was presently dangerous. The frisk was lawful.

■ Defendant next argues that the bindle found in his wallet should have been suppressed, because it was derived by an unlawful search of the blue box.[4] The trial court refused to suppress, reasoning that it would inevitably have been discovered at the jail during the inventory in the jail booking process. The inevitable discovery doctrine is an exception to the rule that unlawfully obtained evidence must be

---

[4] The state does not challenge the court's ruling that Green's search of the box was unlawful. *See State v. Schellhorn*, 95 Or App 297, 301, 769 P2d 221 (1989).

suppressed. ORS 133.683 codifies the doctrine.[5] Generally, it requires that the state show by a preponderance of the evidence that proper and predictable investigatory procedures would have been used and that those procedures would have resulted in a lawful discovery of the derivative evidence. *State v. Miller*, 300 Or 203, 226, 709 P2d 225 (1985) *cert den* 475 US 1141 (1986).

We have no doubt that, as part of the jail's booking process, defendant's personal effects would have been scrutinized, secured and identified by jail personnel. However, even assuming a properly authorized administrative program was systematically administered so that the inventory involved no exercise of law enforcement discretion, *State v. Atkinson*, 298 Or 1, 11, 688 P2d 832 (1984), no evidence was presented regarding the scope of the booking inventory or that it would have inevitably included an inspection of all or any particular part of the wallet. In other words, even assuming that the wallet was seized pursuant to a valid inventory procedure, Green's *testimony* that there would have been a "thorough search" of the wallet presented only his *impressions* of the inventory procedure and did not establish what the Clackamas County Jail's policies were. There is no evidence on the basis of which we could reasonably conclude that the bindle of methamphetamine seized from defendant's wallet would have been inevitably discovered and seized at the jail. We therefore affirm the conviction on the charge of unlawful possession of a firearm and reverse and remand the conviction for possession of a controlled substance.

Conviction for possession of a controlled substance reversed and remanded for a new trial; otherwise affirmed.

---

[5] ORS 133.683 provides:

"If a search or seizure is carried out in such a manner that things seized in the course of the search would be subject to suppression, and as a result of such a search or seizure other evidence is discovered subsequently and offered against a defendant, such evidence shall be subject to a motion to suppress unless the prosecution establishes that such evidence would have been discovered by law enforcement authorities irrespective of such search or seizure, and the court finds that exclusion of such evidence is not necessary to deter violations of ORS 133.525 to 133.703."